UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SHELLBIRD, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | 1:09-cv-1271-SEB-DML |
| vs. ) | |
| ) | |
| DAN GROSSMAN, MAUREEN ) | |
| GROSSMAN and STONE RIDGE ) | |
| ARABIANS, LLC, ) | |
| ) | |
| Defendants. ) | |
| _____) | |
| ) | |
| STONE RIDGE ARABIANS, LLC, ) | |
| ) | |
| Counterclaim Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| SHELLBIRD, INC., MICHELE PFEIFER, ) | |
| and DAVID HALSCH, ) | |
| ) | |
| Counterclaim Defendants. ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

Plaintiff Shellbird, Inc. ("Shellbird") brings the instant suit against Defendants Dan Grossman, Maureen Grossman ("the Grossmans") and Stone Ridge Arabians, LLC ("Stone Ridge"), alleging breach of contract, unjust enrichment, and negligent misrepresentation claims. The parties' dispute centers around a contract for the purchase of an Arabian horse. On January 25, 2010, Defendants filed a Motion for Summary Judgment [Docket No. 33], pursuant to Rule 56 of the Federal Rules of Civil Procedure. Having determined that we have diversity

jurisdiction over this lawsuit, for the reasons discussed herein, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

## *Factual Background*

Shellbird is a Colorado corporation with a principal place of business in Silt, Colorado. The Grossmans are Indiana residents who own and operate a sole proprietorship that does business as Stone Ridge Arabians. Midwest Station II ("Midwest")[1] is a Minnesota corporation that trains, breeds, and markets horses, including the horse at the center of this lawsuit, DA Valentino. DA Valentino is an Arabian stallion, registered at AHR*607142 in the Arabian Horse Registry of America, Inc.

In early February 2008, Shellbird entered into negotiations to purchase DA Valentino from Stone Ridge. At that time, Shellbird negotiated primarily with David Boggs, an employee of Midwest who acted as the trainer and breeder of DA Valentino. On February 23, 2008, while at Midwest's office in Scottsdale, Arizona, Shellbird entered into an agreement to purchase DA Valentino from the Grossmans and signed a document titled, "Midwest Station II, Inc. Installment Purchase and Security Agreement" ("Agreement"). The Agreement states that Shellbird would purchase DA Valentino from Stone Ridge for the total price of $4,500,000. The Agreement also specifies the terms of payment, which included a nineteen month schedule of payments from February 2008 through August of 2009. Shellbird was to pay $50,000 plus five percent interest on the 23rd of every month during the payment period. During the fourth month Shellbird was to pay an additional $1,000,000 "balloon" payment along with the $50,000

---

[1] Midwest is not a party to this case, but Shellbird has alleged that Midwest acted as an agent on behalf of the Grossmans and Stone Ridge throughout the parties' dealings.

payment. The Agreement provides that the $50,000 payments would continue each month thereafter for the following fourteen months, with the balance of $2,550,000 being due on the last month of the payment period. All payments were to be made within a thirty day grace period from the 23rd of each month. If payment was not received within the thirty day grace period, the seller had the right to repossess the horse without recourse from the buyer.

The Agreement also states that Shellbird "is to receive all outstanding breeding receivables on the horse DA Valentino on the previous breeding rights sold to the horse DA Valentino" as well as all future breeding rights. Shellbird claims that, at some point before the signing of the Agreement, Mr. Boggs of Midwest represented to Shellbird that the amount of those outstanding receivables was approximately $440,000 and that, over the course of its breeding life, the horse could be worth twelve to fifteen million dollars. There is no provision in the Agreement, however, that specifies the value of said "outstanding breeding receivables" nor does the contract contain any guarantee as to the future value of DA Valentino. In fact, the Agreement contains a section entitled "Disclaimer of Warranties," which explicitly states: "The buyer understands and agrees that it is buying the horse AS IS. ALL WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY DISCLAIMED." (Defs'. Ans. Ex. 1, at 3).[2]

---

[2] At some later date, the parties signed a revised agreement entitled "Revised Midwest Station II, Inc. Installment Purchase and Security Agreement," which contains an additional term that provides that DA Valentino would remain in the care, custody, and control of Midwest until the entire contract was paid in full. All other terms in the revised agreement are identical to those contained in the original contract. Although Stone Ridge maintains that the revised document is the governing contract, for purposes of this motion, it has cited to and adopts as governing the original agreement because that document is identical on all issues relevant to the
(continued...)

After the parties signed the Agreement, DA Valentino was moved to Midwest's training facility in Minnesota. As of July 2009, Shellbird had paid approximately $1,900,000 of the total purchase price of $4,550,000. Shellbird claims that, because it had not yet received the outstanding receivables from DA Valentino's breedings at that time, it did not make the final payment required to fulfill the terms of the contract. Shellbird asserts that it attempted to discuss and/or renegotiate the final payment in August 2009, but that Defendants did not wish to renegotiate. It is undisputed that DA Valentino was kept at Midwest's training facility in Minnesota for the majority of the time in question and that the horse currently remains housed at that location.

On October 9, 2009, Plaintiff brought the instant suit against the Grossmans and Stone Ridge alleging claims for breach of contract, unjust enrichment, and negligent misrepresentation. Defendants deny these allegations and have moved for summary judgment on all three counts set forth in Plaintiff's complaint.

## *Legal Analysis*

**I.   Standard of Review**

In considering a motion for summary judgment, all facts and reasonable inferences must be construed in favor of the non-moving party, here, Shellbird. Magin v. Monsanto Co., 420 F.3d 679, 686 (7th Cir. 2005). We do not evaluate the weight of the evidence, judge the credibility of witnesses or determine the ultimate truth of the matter; rather, we determine whether there exists a genuine issue of triable fact. Anderson v. Liberty Lobby, 477 U.S. 242,

---

[2](...continued)
instant motion. We follow the parties' lead and refer to the original contract.

245-50 (1986). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Magin, 420 F.3d at 686 (citing Fed.R.Civ.P.56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). The moving party bears the initial burden of demonstrating that these requirements have been met; it may discharge this responsibility by showing "that there is an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 323. To overcome a motion for summary judgment, the non-moving party must come forward with specific facts demonstrating that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. Anderson, 477 U.S. at 251-52. The nonmoving party must show that there is evidence upon which a jury reasonably could find for the plaintiff. Id. If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish its case, summary judgment is not only appropriate, but also required. See Celotex, 477 U.S. at 322.

**II.     Breach of Contract**

Plaintiff claims that Stone Ridge breached the Agreement by failing to provide Plaintiff all of DA Valentino's "outstanding breeding receivables," as required by the contract. (Pl.'s Am. Compl. 4). Under Minnesota law,[3] to establish a breach of contract claim, a plaintiff must show: (1) the formation of the contract; (2) performance by plaintiff of any conditions precedent to his

---

[3] The Agreement states that any disputes among the parties as a result of the Agreement shall be governed by Minnesota law.

right to demand performance by defendant; and (3) a breach of the contract by defendant. Briggs Trans. Co. v. Razenberger, 217 N.W.2d 198, 200 (Minn. 1974). In their briefs, the parties address only the issue of breach, so we limit our discussion accordingly.

The portion of the Agreement relevant to Shellbird's breach of contract claim states as follows: "Buyer is to receive all outstanding breeding receivables on the horse DA Valentino on the previous breeding rights sold to the horse DA Valentino." The contract provides no further explanation of the term "all outstanding breeding receivables," nor is a specific dollar figure included in the Agreement. The contract also contains a merger clause, which provides: "This Agreement constitutes the entire agreement of the Buyer and the Seller with respect to the subject matter hereof and supersedes any prior negotiations, understandings, or writings between the parties with respect to the subject matter hereof." (Defs.' Ans. Ex. 1, at 3). Although the contract is silent as to the specific amount of the past breeding receivables, Shellbird claims that, at some point prior to the signing of the Agreement, Mr. Boggs represented that the total sum of Valentino's outstanding breeding receivables was approximately $440,000. Halsch Dep. 62-63: 18-23, 1-3; Pfeifer Aff. ¶ 4.[4] Shellbird maintains that it did not receive any of the outstanding breeding receivables, or at least that it did not receive an amount anywhere close to $440,000. According to Shellbird, it is impossible to discern from Stone Ridge's accounting records the

---

[4] On April 26, 2010, Defendants moved to strike Michele Pfeifer's Affidavit because she failed to appear at her deposition on April 9, 2010. Ms. Pfeifer has since submitted a doctor's note stating that she was unable to travel to Indiana for her deposition on the scheduled date due to a spinal condition. Ms. Pfeifer subsequently made herself available for a deposition in a timely fashion on May 14, 2010, and Defendants cite to that deposition in their reply brief filed in support of this motion. Because Ms. Pfeifer provided a good faith reason for missing her originally scheduled deposition and her absence did not unduly burden Defendants, the Motion to Strike [Docket No. 68] is hereby DENIED.

exact amount of outstanding breeding receivables that it was supposed to receive, and thus, Mr. Boggs's alleged representations regarding the amount create a question of fact on that issue. Defendants rejoin that consideration of any representations allegedly made by Mr. Boggs before the contract was signed are barred by the parol evidence rule.

The parol evidence rule "prohibits the admission of extrinsic evidence of prior or contemporaneous oral agreements, or prior written agreements, to explain the meaning of a contract when the parties have reduced their agreement to an unambiguous integrated writing. Accordingly, when parties reduce their agreement to writing, parol evidence is ordinarily inadmissible to vary, contradict, or alter the written agreement." Danielson v. Danielson, 721 N.W.2d 335 (Minn. Ct. App. 2006) (quoting Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn., 664 N.W.2d 303, 312 (Minn. 2003)).  In other words, "the terms of a final and integrated written expression may not be contradicted by parol evidence of previous understandings and negotiations . . . for the purpose of varying or contradicting the writing." Apple Valley Red-E-Mix, Inc. v. Mills-Winfield Eng'g Sales, Inc., 436 N.W.2d 121, 123 (Minn. Ct. App. 1989), review denied (Minn. Apr. 26, 1989).  However, "[p]arol evidence is admissible when the agreement is incomplete or ambiguous to explain the meaning of its terms." Flynn v. Sawyer, 272 N.W.2d 904, 908 (Minn. 1978).  "Whether a contract is ambiguous is a question of law to be determined in the first instance by the court." Kenko, Inc. v. Lowry Hill Const. Co., 382 N.W.2d 18, 20 (Minn. Ct. App. 1986).  Contract language is ambiguous "if it is susceptible to two or more reasonable interpretations." Dykes v. Sukup Mfg. Co., 781 N.W.2d 578, 582 (Minn. 2010).

Stone Ridge argues that evidence of Mr. Boggs's alleged representations regarding the

7

value of DA Valentino's outstanding breeding receivables is inadmissible parol evidence because the term "all outstanding breeding receivables" is clearly defined in the Agreement and is facially unambiguous. Shellbird, however, contends that, because the Agreement does not specify the monetary value of the term "all outstanding breeding receivables," the contract language is ambiguous, and thus, the extrinsic evidence regarding Mr. Bogg's alleged prior representations is admissible to assist the court in determining the parties' intent.

We are persuaded that the Agreement is incomplete as to the meaning of this phrase. Although we agree with Defendants that the phrase "outstanding breeding receivables" is itself unambiguous, it is unclear from the contract what the parties intended "all" to mean. "If the language is incomplete or ambiguous, evidence relevant to the intent of the parties – parol evidence – may be considered." Leighton v. Rossow, 2010 WL 772341, at *7 (Minn. Ct. App. Mar. 9, 2010) (citing Material Movers, Inc. v. Hill, 316 N.W.2d 13, 17 (Minn. 1982)). Here, because the Agreement does not include a monetary value of "all outstanding breeding receivables" or otherwise define the term "all", we find that the contract is incomplete and that extrinsic evidence is therefore admissible to aid the Court in understanding and explaining its meaning.

As discussed above, Shellbird alleges that it was told by Stone Ridge's agent, Mr. Boggs, before it signed the Agreement that the outstanding breeding receivables totaled approximately $440,000. Further, Shellbird's CFO, David Halsch, testified in his deposition, "We didn't receive near that amount of money." Halsch Dep. at 63. Shellbird further alleges that Stone Ridge's records are so disorganized and incomplete that it is impossible to use them to independently determine the total amount of DA Valentino's outstanding breeding receivables.

Stone Ridge neither refutes these allegations, nor presents any evidence to establish the amount Shellbird was entitled to receive or even that it has paid to Shellbird the outstanding receivables as promised in the Agreement. Thus, genuine issues of material fact remain regarding the amount of outstanding breeding receivables Shellbird was entitled to receive and whether Stone Ridge paid Shellbird that or any other specific amount. Accordingly, we <u>DENY</u> Defendants' Motion for Summary Judgment as to the breach of contract claim.[5]

### III. Unjust Enrichment

In its Amended Complaint, Shellbird also brings a claim against Defendants for unjust enrichment, alleging that Stone Ridge was unjustly enriched by $1,900,000, the amount that Shellbird had paid toward the total purchase price of DA Valentino before failing to make the final payment. However, it is undisputed that both Shellbird and Defendants entered into and signed the Agreement, an express contract which governed their dealings relating to the matters at issue here. As Defendants argue, Minnesota law "does not allow recovery under an unjust enrichment theory when there is an express contract which governs the parties' relations." <u>Northwest Airlines v. Aestraea Aviation Servs.</u>, 111 F.3d 1386, 1392 (8th Cir. 1997); <u>accord</u> <u>Zupancich v. U.S. Steel Corp.</u>, No. 08-5847, 2009 WL 1474772, at *3 (D. Minn. May 27, 2009). In its responsive briefing on this motion, Shellbird wholly failed to respond to Defendants' arguments or otherwise make any mention of the unjust enrichment claim and has thus waived

---

[5] Plaintiff argues in its responsive briefing on this motion that Defendants also breached the contract by continuing to board DA Valentino at Midwest rather than delivering possession of the horse to Shellbird. However, Plaintiff did not plead non-delivery of possession in its Amended Complaint, nor are there facts in the record to support Plaintiff's claim that Defendants' failure to deliver possession of the horse before Shellbird had made all of the required installment payments was in violation of any of the terms of the contract. Accordingly, we need not address this late-breaking theory further.

this issue. Accordingly, Defendants are entitled to summary judgment on Plaintiff's unjust enrichment claim.

### IV.     Negligent Misrepresentation

Shellbird's final claim is for negligent representation under Minnesota law. Shellbird alleges that Stone Ridge, through its agent, Midwest, made false representations regarding DA Valentino's breeding value that Shellbird relied upon in deciding to purchase the horse. Following the Restatement (Second) of Torts § 552, Minnesota courts have held that negligent misrepresentation involving pecuniary loss consists of:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Smith v. Brutger Cos., 569 N.W.2d 408, 414 (Minn. 1997).

We will assume for purposes of our analysis that Midwest and its employees were in fact agents of Stone Ridge. Even if that agency relationship existed, however, Shellbird is unable to survive summary judgment on its negligent misrepresentation claim because it is unable to show that its reliance on the alleged misrepresentations was justifiable as required under Minnesota law. Initially, we note that Plaintiff's allegations of negligent misrepresentation set forth in its Amended Complaint provide only that, "Defendants and/or their agent thereby supplied false information to Plaintiff in the course of their business transactions concerning Valentino." (Pl.'s Am. Compl. 5). Plaintiff makes no reference in its Amended Complaint as to the specific information it was referring to or when that information was allegedly provided to Shellbird,

only that Defendant failed to exercise reasonable care and that Plaintiff relied on that allegedly false information. Not until its responsive brief on this motion does Plaintiff contend that the alleged negligent representations related to the amount of DA Valentino's past breeding receivables as well as his future breeding potential. (Pl.'s Br. 11). However, when asked in their interrogatories to state all representations made and all false information given by Midwest, Plaintiff affirmed under penalty of perjury that the representations and information pertained only to *future* breeding values and semen quality. (Counter Def.'s Answers to Interrogs. 4-7). Thus, our analysis of Plaintiff's negligent misrepresentation claim is necessarily based only upon the alleged representations regarding DA Valentino's future breeding potential.

Plaintiff claims that it relied on the allegedly false representations made by Midwest regarding the potential value of DA Valentino's future breeding revenue and that Stone Ridge failed to exercise reasonable care in its communications throughout the negotiation process. However, Plaintiff has failed to show that its reliance on Midwest's representations was justifiable as it must do to establish its claim of negligent misrepresentation. First, as a matter of law, Minnesota courts find reliance unjustifiable when, "the written contract provision explicitly stated a fact completely contradictory to the claimed misrepresentation." Johnson Building Co. v. River Bluff Dev. Co., 374 N.W.2d 187, 194 (Minn. Ct. App. 1985). Such is the situation here. Shellbird claims that Midwest stated that DA Valentino's breeding rights over his lifetime could be worth approximately twelve to fifteen million dollars, (Pfeifer Aff. ¶ 3); (Halsch Dep. 21: 9-13), yet the revised Agreement plainly states: "Disclaimer of Warranties: The Buyer understands and agrees that it is buying the horse AS IS. ALL WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A

11

PARTICULAR PURPOSE, ARE HEREBY DISCLAIMED." (Defs.' Ans. Ex. 1, at 3).  This portion of the Agreement explicitly provides that any express warranties, in addition to any guaranties at to the merchantability of the horse, were thereby waived.  This disclaimer is directly contradictory to any representations that may have been made regarding the horse's potential breeding revenue; thus, Plaintiff's reliance on such representations was unjustifiable as a matter of law and cannot be used to maintain a negligent misrepresentation claim.  Dahmes v. Indus. Credit Co., 110 N.W.2d 484, 490 (Minn. 1961).

     Futhermore, Plaintiff's contention that it justifiably relied on Defendants' agent's alleged misrepresentations cannot be true because Plaintiff was an experienced buyer and seller in the horse market, had intimate knowledge of the processes involved, and had independent knowledge regarding DA Valentino's fertility.  For example, Michele Pfeifer, the President of Shellbird, testified that she had executed at least twelve contracts with Midwest as either a buyer or seller in the previous ten years.  Pfeifer Depo. at 106; 23-107; 3.  David Halsch, CFO of Shellbird, stated that he and Ms. Pfeifer were familiar with the contract and the disclaimer when they signed it, and that it was the "same exact contract produced by Midwest for prior purchases."  Halsch Depo. at 32-3.  Most importantly, before signing the contract, Plaintiff twice had its own veterinarian examine semen samples from DA Valentino, and on the second occasion the veterinarian personally witnessed the collection of the sample.  Pfeifer Depo. at 120-21.  Thus, in addition to the express disclaimer regarding all warranties in the contract, Plaintiff was in possession of independent information regarding DA Valentino's fertility, making any reliance on contradictory representations regarding the horse's breeding potential highly questionable.  Because, for the reasons detailed above, Plaintiff is unable to show that its

reliance on any alleged misrepresentations was justifiable, its claim for negligent misrepresentation cannot survive summary judgment.

## *Conclusion*

For the reasons detailed in this entry, we GRANT Defendants' Motion for Summary Judgment as to Plaintiff's unjust enrichment and negligent representation claims. Because we find that a genuine issue of material fact exists regarding the amount of outstanding breeding receivables Plaintiff was to receive pursuant to the parties' agreement, we DENY Defendants' Motion for Summary Judgment as to Plaintiff's breach of contract claim.

**IT IS SO ORDERED.**

Date: 07/23/2010

*[signature: Sarah Evans Barker]*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Amos S. Cohen
MALLOR CLENDENING GRODNER & BOHRER LLP
acohen@mcgb.com

Geoffrey Mitchell Grodner
MALLOR CLENDENING GRODNER & BOHRER
gmgrodne@mcgb.com

Bradley Kim Thomas
THOMAS & HARDY LLP
brad@thomaslawfirmpc.com