UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| Shellbird, Inc., | ) |
|       Plaintiff, | ) |
| | ) 1:09-cv-1271-SEB-DML |
| vs. | ) |
| Dan and Maureen Grossman d/b/a Stone Ridge Arabians, | ) |
|       Defendants. | ) |
| | ) |
| Stone Ridge Arabians, LLC, | ) |
|       Counter Plaintiff, | ) |
| vs. | ) |
| Shellbird, Inc. and Michele Pfeifer, individually and as a member of Shellbird, Inc. | ) |
|       Counter Defendants. | ) |

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL**[1]

---

[1] Since the filing of this lawsuit, the parties entered into stipulations regarding the care and custody of D.A. Valentino, the Arabian stallion at issue in this case. See Docket Nos. 29, 40. On April 7, 2011, the Court held an evidentiary hearing on Defendants/Counter Plaintiff's Motion for Order Authorizing Sale of DA Valentino. At that hearing, the Court ruled that it would permit the sale of D.A. Valentino and instructed the parties to tender a proposed order. Docket No. 117. Unfortunately, only a few days later, D.A. Valentino collapsed in his stall and had to be euthanized. Thereafter, the Court signed the parties' Agreed Order for Accounting. Docket Nos. 119, 122.

This matter came before the Court for a bench trial on November 18, 2011. Although this litigation previously included claims for unjust enrichment and negligent misrepresentation, these claims were dismissed prior to trial pursuant to the Court's Order. See Docket No. 80. The parties entered into various stipulations. Thus, the evidence adduced at trial and the issues requiring a judicial determination were significantly streamlined. Ultimately, the only surviving claims were those brought by Counter Plaintiff Stone Ridge Arabians, LLC against Shellbird, Inc. and Michele Pfeifer relating to: (1) whether, and if so, to what extent Michele Pfeifer is personally liable for the $2,184,782.90[2] that the parties have stipulated is the remaining amount due from Shellbird, Inc. ("Shellbird") to Stone Ridge Arabians ("Stone Ridge") for the purchase of D.A. Valentino; and (2) who owns the remaining assets related to Valentino. We address each of these issues below.

**I.    Factual Background**

Counter Plaintiff Stone Ridge is an Indiana limited liability company of which Defendants Dan and Maureen Grossman are the sole members. Shellbird is a Colorado corporation of which Michele Pfeifer is the President as well as the sole shareholder. Pfeifer's former husband, David Halsch, served as the Chief Financial Officer of Shellbird during 2008 and the first part of 2009. There is no evidence that Shellbird has

---

[2]At trial, the parties orally stipulated that the amount currently owed is $2,171,032.90. However, both parties have referenced the amount of $2,184,782.90 in their respective Proposed Judgments and Proposed Findings of Fact and Conclusions of Law. Because both parties have submitted this same amount in their Proposed Judgments, we have adopted the latter figure for purposes of this Entry.

ever had any officers or directors beyond Ms. Pfeifer and Mr. Halsch.

On February 23, 2008, an "Installment Purchase and Security Agreement" was executed providing for the purchase of the Arabian stallion, D.A. Valentino ("Valentino") from his owner, the Grossmans and Stone Ridge.[3] Shellbird, Ms. Pfeifer, and Mr. Halsch were each named on the first page of that agreement as the "Buyer." Stone Ridge and the Grossmans were designated as the "Seller." Ms. Pfeifer signed that purchase agreement "Michele Pfeifer, President," presumably identifying herself as President of Shellbird. A slightly revised version of that agreement (the "Agreement") was executed the next day, February 24, 2008.[4] While the "Buyer" and "Seller" portions of the Agreement were identical to the version executed the day before, only Mr. Halsch signed the second document; the parties maintain that it is controlling in terms of resolving the issues before the Court. There is no dispute over the fact that Mr. Halsch was authorized by Ms.

---

[3] Mr. Grossman testified that the majority of negotiations over this purchase agreement took place between Mr. Halsch and himself after Ms. Pfeifer indicated to Mr. Halsch that she wanted the horse and told him to "get it done." Mr. Grossman testified that Ms. Pfeifer was very emotional about the transaction and had tears in her eyes when she gave those instructions and departed. He testified that he understood that Mr. Halsch was acting on behalf of Ms. Pfeifer because he was under the impression that Ms. Pfeifer was the one with adequate funds to purchase Valentino. Finally, he testified that he did not know who or what Shellbird was at the time the parties entered into the purchase agreement because he believed Ms. Pfeifer would assume responsibility for the obligations the purchasers undertook.

[4] The only modification to the purchase agreement was the addition of the following term: "DA Valentino must remain in the care, custody and control of Midwest, until a contract is paid in full." Midwest Station II, Inc. was a Minnesota corporation of which David Boggs was owner.

Pfeifer to negotiate and execute the Agreement.[5]

On that same date, February 24, 2008, Valentino was declared the "Supreme Champion" at the largest Arabian horse show in the world, held in Scottsdale, Arizona. Mr. Boggs testified that one of the reasons the Agreement was signed prior to that show was because it was very important to Ms. Pfeifer that she be identified at that show as Valentino's owner. Ms. Pfeifer's and Mr. Halsch's names were also included as the owners on various Shellbird advertisements for Valentino. Counter Pls.' Exs. E, G.

The Agreement provided for a total purchase price of $4.5 million to be paid in installments by Buyer extending over an eighteen-month period. Shellbird made several initial payments pursuant to this Agreement, eventually reaching the total sum of approximately $1.9 million. However, on July 23, 2009, Shellbird failed to pay Stone Ridge the installment then due in the amount of $50,000. Shellbird has also failed to pay the remaining balance of the purchase price, – $2.55 million – due on August 23, 2009 under the Agreement. Thus, the amount of unpaid payments under the Agreement as of that time stood at $2.6 million, with interest accruing at the rate of five percent (5%) per annum. The parties have stipulated that the total unpaid interest amount was $312,712.33 as of November 18, 2011, which was the date of trial. Thus, the total balance due including interest, according to the stipulations of the parties, is $2,912,712.33. An additional monetary damage incurred by Stone Ridge arose when it was forced to secure

---

[5]Mr. Halsch was previously a party to this lawsuit but was dismissed by stipulation as an individual defendant.

replacement insurance coverage on Valentino at its own expense in the amount of $13,750.00 after Ms. Pfeifer wrongfully cancelled the insurance coverage she was required to maintain.[6] However, this total indebtedness was decreased by $500,000 reflecting the amount of the insurance proceeds Stone Ridge recovered following Valentino's death and by an additional $13,679.00 Stone Ridge received from Midwest, constituting the remaining amount in the Trust Account maintained in connection with this account. The parties also agreed to reduce the amount of the indebtedness to Stone Ridge from Shellbird and Ms. Pfeifer by an additional $228,000 as a compromise to resolve various disputed, but lesser claims relating to the total amount of breeding receivables due Plaintiff as of the date the Agreement was executed. To summarize, the total stipulated indebtedness was $2,184,782.90 owed by Counter Defendants to Counter Plaintiff as of November 18, 2011.

Shellbird was originally formed as a corporation in 1997, and between 2000 and 2010 the business bought and/or sold approximately ninety horses. Shellbird's income

---

[6]By Order of this Court (as well as pursuant to the terms of the Agreement), Shellbird was directed to maintain insurance coverage on Valentino until the terms of the sale were finally completed and ownership passed to Shellbird and Ms. Pfeifer. In accordance with that Order, Shellbird provided to Stone Ridge a Certificate of Insurance for a period up to and including February 23, 2011. Without providing notice either to the Court or to Stone Ridge, Ms. Pfeifer (apparently acting on behalf of Shellbird) unilaterally and precipitously cancelled the insurance coverage, effective November 1, 2010. This cancellation resulted in a refund to Shellbird from the insurance carrier in the amount of $38,793.00, reflecting the unearned insurance premium. Learning of this cessation in coverage, Stone Ridge, at its own expense, in the amount of $13,750.00, secured replacement insurance coverage on Valentino.
    Tragically, as we have previously mentioned, on April 8, 2011, Valentino collapsed in his stall and had to be euthanized due to the related medical complications. Following Valentino's death, Stone Ridge recovered $500,000.00 from the insurance coverage proceeds.

5

also derived from approximately $75,000.00 in annual sales of hay. Despite these earnings, according to Mr. Halsch's testimony, Shellbird has never achieved an annual profit, requiring the corporation to be subsidized each year by Ms. Pfeifer's personal funds. The real estate on which Shellbird operates is also owned by Ms. Pfeifer personally. Indeed, Counter Defendants concede that Shellbird on its own did not have sufficient assets or cash flow required to satisfy the terms of the Agreement to purchase Valentino. Mr. Halsch testified that he and Ms. Pfeifer planned to sell certain horses then owned by Shellbird in order to generate the cash flow to pay for Valentino. However, they planned that $4 million of the $4.5 million purchase price would come from the sale of assets owned by Ms. Pfeifer personally. The $1 million payment made by Shellbird in May 2008 pursuant to the Agreement were funds generated by a loan which was secured by Ms. Pfeifer's personal interests in the real estate. Ms. Pfeifer was reportedly relying on income she expected to receive personally from a family trust to pay the purchase price.

Shellbird employed staff people who were paid by the corporation to care for the horses. However, these employees also regularly assisted Ms. Pfeifer in connection with her personal and financial affairs, particularly in maintaining the grounds of the ranch which she owned personally.

The parties have stipulated to the following additional facts:

- As of May 2011, Midwest possessed approximately 2870 straws of frozen semen withdrawn from Valentino and stored at its facility in Minnesota. Another approximately 1750 straws of frozen semen are stored at its facility

>        in Scottsdale, Arizona.

- The value of the frozen semen is speculative and cannot be determined with reasonable certainty in an uncertain marketplace.

- Shellbird does not have in its possession or control any frozen semen taken from Valentino; however, Shellbird is in possession of fifty-one (51) Transport Semen Certificates (TSC) for use with Valentino (sic) frozen semen.

- The intellectual property associated with Valentino includes a stylized "V," which Shellbird owns and for which it maintains a Trademark registration.

## II.    Legal Analysis

As noted above, by virtue of the parties' stipulations, the only issues requiring adjudication by the Court are these: (1) whether, and if so, to what extent Ms. Pfeifer is personally liable for the indebtedness due under the Agreement to Counter Plaintiff pursuant to the Agreement; and (2) who owns the remaining assets related to Valentino, including his frozen semen, TSC's, and the stylized "V" for which Shellbird maintains a Trademark registration.  We address and resolve each of these issues below.

### A.    The Extent of Pfeifer's Personal Liability

Counter Plaintiff has urged the Court to pierce the corporate veil of Shellbird on the grounds that Shellbird was formed and operated as the alter ego of Pfeifer and thereby to hold her personally liable for the arrearages due under the Agreement. The parties agree that Minnesota law applies to these issues in dispute, and we agree with that conclusion based on our application of the "most intimate contacts" rule applied under

Indiana law.[7]  Secon Serv. Sys. v. St. Joseph Bank & Trust Co., 855 F.2d 406, 412-13 (7th Cir. 1988)(using the "most intimate [or significant] contacts" approach to determine that Indiana law governed despite the alternate state of incorporation).  We, therefore, begin by undertaking a review of Minnesota law in light of the issues before us.

In Victoria Elevator Co. v. Meriden Grain Co., Inc., 283 N.W.2d 509 (Minn. 1979), the Minnesota Supreme Court granted a similar request to disregard the corporate entity, holding that a shareholder is individually liable for a breach of contract.  Applying the principles laid out in Victoria Elevator Co., the Minnesota Court of Appeals provided this guidance in a recent decision:

> Under limited circumstances . . . a district court may pierce the corporate veil to hold a party liable for the acts of a corporate entity.  Such circumstances exist when the corporation was formed as the shareholder's "alter ego" or as a mere "instrumentality" and there is an "element of injustice or fundamental unfairness" to be avoided.  Several factors are considered when determining whether a corporation was formed as the shareholder's alter ego, including whether (1) there is sufficient capitalization for purposes of corporate undertaking; (2) corporate formalities have been observed; (3) dividends have been paid; (4) the debtor corporation was solvent at the time of the transaction in question; (5) the dominant shareholder siphoned funds; (6) there is a nonfunctioning of other officers and directors; (7) there is an absence of corporate records; and (8)

---

[7]District courts apply the choice of law rules of the jurisdiction in which they sit.  Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941).  Under Indiana's "most intimate contacts" approach, courts consider the factors listed in the Restatement (Second) of Conflict of Laws § 188 (1971): the places of contracting, negotiating, and performance; the location of the contract's subject matter; and the locations of the parties.  Secon Serv. Sys. v. St. Joseph Bank & Trust Co., 855 F.2d 406, 412-13 (7th Cir. 1988)(citing Eby v. York Division, Borg-Warner, 455 N.E.2d 623, 626 (4th Dist. 1983) and Hubbard Mfg. Co. v. Greeson, 515 N.E.2d 1071, 1073 (Ind. 1987)).  These factors redound in favor of Minnesota law, despite the Counter Plaintiff's location (Indiana) and Counter Defendants'/Shellbird's place of incorporation and Ms. Pfeifer's residence (Colorado).

the corporation exists as a mere facade for individual dealings. When using the alter ego theory to pierce the corporate veil, courts look to the reality and not form, with how the corporation operated and the individual defendant's relationship to that operation.

Kromrey v. Ali, Case No. A10-785, 2011 Minn. App. Unpub. LEXIS 143, at *4-5 (D. Minn. Feb. 15, 2011)(citing Hoyt Props., Inc. v. Prod. Res. Group, L.L.C., 736 N.W.2d 313, 318 (Minn. 2007)). Thus, the analysis of whether to pierce the corporate veil is two pronged: First, the Court must determine whether sufficient factors weigh in favor of a finding that the corporation was formed as the shareholder's alter ego. If so, the Court must next determine whether the essential element of injustice or fundamental unfairness was present. See Victoria Elevator Co., 283 N.W.2d at 512. "Proof of strict common-law fraud is not required, but evidence that the corporate entity has been operated as a constructive fraud or in an unjust manner must be presented." Paynesville Farmers Union Oil Co.v. Ever Ready Oil Co., 379 N.W. 2d 186, 189 (Minn. Ct. App. 1985).

In our case, it is undisputed that Shellbird was insufficiently capitalized for purposes of purchasing Valentino at the time the Agreement was executed. As noted above, Mr. Halsch testified that over $4 million of the $4.5 million purchase price was to be paid from Ms. Pfeifer's personal income and assets. In addition, Mr. Halsch testified that never during its existence has Shellbird ever made a profit. Mr. Halsch also testified that the only officers of Shellbird were Ms. Pfeifer and himself (which role primarily related to his marital status, we assume, since it ended with the dissolution of his marriage

9

to Ms. Pfeifer). As noted above, Shellbird's employees were also tasked with responsibility for various personal affairs of Ms. Pfeifer and the entire operation was run from real estate owned by Ms. Pfeifer personally. Ms. Pfeifer appears to have treated Shellbird's business as her own, including the way in which she reportedly made highly emotional and personalized decisions to buy and sell horses based on her own ego, when her personal role during contract negotiations, at trade shows, and in advertisements and motivations in becoming the owner of Valentino overrode and outweighed the business and financial considerations.

Substantial evidence was adduced regarding Ms. Pfeifer's periodic capital contributions to Shellbird, but there was no evidence to indicate that she siphoned funds away from the company and there was no evidence adduced with regard to Shellbird's payment of dividends or the maintenance of corporate records. The only evidence of Shellbird's observance of corporate formalities was Shellbird's Articles of Incorporation, Plaintiff's Exhibit 1.

While not all of the factors laid out in <u>Kromrey</u> favor a finding that Shellbird was Ms. Pfeifer's "alter ego," a sufficient number of the most significant ones do support that conclusion. <u>Accord</u> <u>Kromrey</u>, 2011 Minn. App. Unpub. LEXIS 143, at *5-6 (finding the lack of observance of corporate formalities, the lack of functioning officers and directors, and that the corporation was a mere facade for individual dealings sufficient to support a court's decision to pierce the corporate veil). There was insufficient capitalization for the purchase of Valentino, corporate formalities do not appear to have been observed,

dividends were not paid, there is a question at least as to Shellbird's solvency at the time of the purchase of Valentino, the functioning of Mr. Halsch as "Chief Financial Officer" of Shellbird was far short of independent from Ms. Pfeifer's personal direction and wishes, and at least with regard to the evidence before us, Shellbird existed as a facade for Ms. Pfeifer's individual dealings. Thus, based on the reality of how Shellbird was operated and how Ms. Pfeifer herself treated that corporation and following the directions given under Minnesota law, we find that Shellbird existed and clearly was being operated as Ms. Pfeifer's alter ego.

Regarding the element of injustice or fundamental unfairness which must also support a conclusion to pierce the corporate veil, in our judgment such fundamental unfairness would result if only Shellbird were held liable on the Agreement that Ms. Pfeifer clearly and individually entered into as well. "When the factors for piercing the corporate veil are present, 'to allow an individual to escape liability because he does his business under a corporate form is to allow him an advantage he does not deserve.'" Kromrey, 2011 Minn. App. Unpub. LEXIS 143, at *7(quoting Victoria Elevator, 283 N.W.2d at 512). Here, as discussed above, Ms. Pfeifer treated the purchase of Valentino and every other aspect of Shellbird's business as her own to such an extent that those dealing with her, i.e. Mr. Boggs and Mr. Grossman, even Mr. Halsch, we think, had no reason to know that they were dealing with any entity other than Ms. Pfeifer personally. To allow her to attempt to escape liability by hiding behind a corporate shield now that her contractual obligations have become due would result in an undeserved advantage to

her and a fundamental unfairness to Counter Plaintiff, whose members, the Grossmans, simply seek to recover what they were promised in entering into this transaction.

Accordingly, we hold that the evidence supports a decision to pierce the corporate veil and in so doing to find both Shellbird and Ms. Pfeifer jointly and severally liable on the indebtedness under the Agreement that is now owed to Counter Plaintiff.

### B. Remaining Assets Related to Valentino

We address finally the parties' disagreement over Valentino's frozen semen, the Transport Semen Certificates, and the stylized "V" for which Shellbird currently maintains a Trademark registration. No evidence regarding these issues was presented at trial. However, as previously noted, the parties have stipulated that straws of frozen semen exist and are stored at both of the Midwest facilities (the value of which is speculative), that Shellbird possesses fifty-one (51) Transport Semen Certificates (TSC) for the use of Valentino's frozen semen, and that the stylized "V" exists as intellectual property.

Counter Plaintiff asks that we grant it the exclusive right to access, utilize, and commercially exploit the frozen semen, TSC's, and stylized "V." Although sparse argument supports this alleged entitlement to these property rights, the gravamen of Counter Plaintiff's position appears to be that the "defaulting parties [Shellbird and Ms. Pfeifer] are not now entitled to benefits they would have derived under [the Agreement], like the value, if any, of the frozen semen, had they performed the terms of [the Agreement] and paid Stone Ridge." As Stone Ridge notes, the appropriate measure of

damages for breach of contract is the amount which will place the non-breaching party in the same situation as if the contract had been performed. See Peters v. Mutual Ben. Life Ins. Co., 420 N.W.2d 908, 915 (Minn. Ct. App. 1988). This is the amount that the parties have agreed is due to Counter Plaintiff, to wit, the unpaid balance under the Agreement. Thus, Counter Plaintiff is entitled to be restored to the same position it would have been in but for Shellbird's breach, pursuant to the Agreement.

The Agreement granted a security interest to Counter Plaintiff in Valentino in order to secure Shellbird's obligations. The Agreement also indicated that, in the event of default, Counter Plaintiff is entitled to exercise its rights after default pursuant to the applicable provisions of the Uniform Commercial Code as adopted in Minnesota.[8] The relevant portion of that Code provides that, after default, the secured party may take possession of the collateral, see MINN. STAT. § 336.9-609 (2011), and with regard to disposition, the statute specifically provides:

> (a) **Disposition after default.** After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing.
>
> (b) **Commercially reasonable disposition.** Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any

---

[8]Counter Plaintiff correctly points out that there was no evidence presented at trial regarding the requirements of the Uniform Commercial Code. However, no such evidence of the law is required to support our findings.

terms.

MINN. STAT. § 336.9-610 (2011). Thus, as the secured party, the applicable law entitled Counter Plaintiff to take possession and sell or dispose of the collateral, i.e. the frozen semen, TSC's, and the stylized "V," in a commercially reasonable disposition.[9] In the event that the Counter Plaintiff seeks to retain the rights to this collateral, which we believe is a distinct possibility given its request for such in their Proposed Judgment, it may purchase the collateral "(1) at a public disposition; or (2) at a private disposition only if the collateral is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations." MINN. STAT. § 336.9-610. In any event, the proceeds of the disposition shall be applied in a manner consistent with MINN. STAT. § 336.9-615, which provides as follows:

> **Application of Proceeds of Disposition; Liability for Deficiency and Right to Surplus**
>
> (a) **Application of proceeds.** A secured party shall apply or pay over for application the cash proceeds of disposition under section 336.9-610 in the following order to:
>
>> (1) the reasonable expenses of retaking, holding, preparing for disposition, processing, and disposing, and, to the extent provided for by agreement and not prohibited by law, reasonable attorneys fees and legal expenses incurred by the secured party;
>>
>> (2) the satisfaction of obligations secured by the security interest or

---

[9] We note that the Agreement does provide that "Seller is to retain 200 frozen semen straws of the horse DA Valentino." Def.'s Ex. C. Nothing about our decision today alters Counter Plaintiff's entitlement to those straws which would have been theirs if Shellbird had not breached the Agreement.

agricultural lien under which the disposition is made;

\*\*\*

(d) **Surplus or deficiency if obligation secured.** If the security interest under which a disposition is made secures payment or performance of an obligation, after making the payments and applications required by subsection (a) and permitted by subsection (c):

(1) unless subsection (a)(4) requires the secured party to apply or pay over cash proceeds to a consignor, the secured party shall account to and pay a debtor for any surplus; and

(2) the obligor is liable for any deficiency.

MINN. STAT. § 336.9-615.

In sum, Counter Plaintiff is awarded possession of the collateral and the rights to either dispose of that collateral in a commercially reasonable manner or to retain it after a purchase consistent with MINN. STAT. § 336.9-610. The proceeds of any sale of the collateral will be applied in the manner promulgated by MINN. STAT. § 336.9-615, to the extent that those expenses and obligations exist.

### III. Conclusion

Judgment is hereby entered in favor of Stone Ridge Arabians, LLC, and against Shellbird, Inc. and Michele Pfeifer, jointly and severally, as follows:

A. In the amount of $2,184,782.90 plus interest at the rate specified in the Agreement of five percent (5%) per annum[10] from November 18, 2011 until

---

[10]Counter Plaintiff's Proposed Judgment requests that the interest be tabulated at the "statutory rate," as opposed to the rate specified in the Agreement and which the parties agreed

(continued...)

15

the date the Judgment is paid in full.

B. Stone Ridge Arabians, LLC is awarded possession of the remaining collateral at issue related to Valentino, i.e. the frozen semen, Transport Semen Certificates, and the stylized "V" for which Shellbird maintains a Trademark, and may dispose of such property in a commercially reasonable manner, consistent with its rights and obligations in the event of default, pursuant to the Uniform Commercial Code as adopted in Minnesota, MINN. STAT. § 336.9 *et. seq.*

IT IS SO ORDERED.

Date:_____01/23/2012_____          _____*Sarah Evans Barker*_____
                                                                                                   SARAH EVANS BARKER, JUDGE
                                                                                                   United States District Court
                                                                                                   Southern District of Indiana

---

[10](...continued)
to for the period leading up to trial. It provides no discussion of what this "statutory rate" is or how it would be tabulated, and has provided no response to Shellbird's suggestion that the interest continue to accrue at the rate specified in the Agreement. Based on these facts and because we see no reason to change the rate at which interest accrues beginning on the day of trial, we hold that interest on the balance due under the Agreement shall continue to accrue at the rate specified in the parties' Agreement, i.e. five percent (5%) per annum.

Copies to:

Martine Romy Bernard
MALLOR GRODNER LLP
rbernard@lawmg.net

Geoffrey Mitchell Grodner
MALLOR GRODNER LLP
gmg@lawmg.net

Andre Fereole Regard
REGARD LAW GROUP, PLLC
aregard@regardlaw.com

Bradley Kim Thomas
THOMAS & HARDY LLP
brad@thomaslawfirmpc.com

Aaron K Westlake
THOMAS LAW FIRM PC
aaron@thomaslawfirmpc.com